**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KENMORE NY TEACHERS FEDERAL CREDIT UNION, on Behalf of Itself and All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMAND |
| FAIR ISAAC CORPORATION, EQUIFAX, INC., EXPERIAN PLC, and TRANSUNION, LLC | |
| Defendants. | |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..................................................................................... 1

II.     PARTIES ................................................................................................................. 7

A.      Plaintiff ................................................................................................................... 7

        B.      Defendants ................................................................................................... 8

III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE ....................................... 8

IV.     FACTUAL ALLEGATIONS ..................................................................................... 9

A.      Credit Scores And Credit Reports ........................................................................... 9

        B.      The Markets for Credit Scores in the United States ................................... 11

        C.      Fair Isaac's Monopoly Power in the B2B Credit Score Market ............................ 15

        D.      VantageScore's Entry Into The Market And Its Innovative Product ..................... 17

        E.      Fair Isaac's Anticompetitive and Exclusionary Conduct ......................................... 20

1.      Fair Isaac's Anticompetitive Litigation. .................................................................. 21

        2.      Anticompetitive Agreements Between Credit Bureaus And Fair Isaac That
                Restrained Competition And Allocated Markets ........................................ 21

                a.      The "No Equivalent Products" Provisions ..................................... 22

                b.      The "Dynamic Royalty Schedule" Provision And Fair Isaac's Use
                        of It In The "Pre-Qualification" Context ........................................ 24

                c.      The "Level Playing Field" Provision .............................................. 25

        3.      Fair Isaac's Other Efforts To Deter B2B Customers From Using
                VantageScore ............................................................................................. 25

        4.      Fair Isaac's Anticompetitive and Exclusionary Conduct Harms
                Competition ................................................................................................. 28

V.      CLASS ACTION ALLEGATIONS ......................................................................... 29

VI.     STATUTES OF LIMITATIONS AND TOLLING ...................................................... 31

VII.    CLAIMS FOR RELIEF .......................................................................................... 32

                CLAIM ONE: MONOPOLIZATION (15 U.S.C. §2) .................... 32

                CLAIM TWO: CONSPIRACY TO MONOPOLIZE .................... 33

CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE 35

CLAIM FOUR: STATE ANTITRUST LAWS ............................. 36

CLAIM FIVE: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS ....................................................................... 43

VIII.  PRAYER FOR RELIEF ...................................................................... 53

IX.  DEMAND FOR JURY TRIAL ......................................................... 54

Plaintiff Kenmore NY Teachers Federal Credit Union ("Kenmore" or "Plaintiff"), on behalf of itself and all similarly situated entities in the United States and its territories, brings this action pursuant to Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§1, 2, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), as well as certain state antitrust and consumer protection laws, against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian plc ("Experian"), and TransUnion, LLC ("TransUnion") (collectively Defendants", with the latter three being referred to collectively as the "Credit Bureaus" or the "Credit Bureau Defendants"), resulting from their restraining trade, monopolizing, and/or conspiring to monopolize from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased (the "Class Period"). The allegations of this Complaint are based on personal knowledge as to the allegations concerning Kenmore and on information and belief as to all other matters.

## I.  NATURE OF THE ACTION

1.  A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on such factors as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; negative public records like bankruptcies or adverse judgments; and assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks, mortgage companies, credit unions and other businesses that assess individual credit risk. This is referred to herein as the "B2B Credit Score Market". The second is the market for the sale of such scores to the individual that is the subject of them. This is referred to herein as the "B2C Credit Score Market".

2.  This case concerns the B2B Credit Score Market, over which Defendant Fair Isaac has maintained at least a 90% share for years, thus conferring monopoly power upon it. Even if Fair Isaac's monopoly was originally obtained in a lawful manner, it has maintained that monopoly by violating the Sherman Act.

3.  Fair Isaac issues "FICO" credit scores that are used routinely by lenders and others to assess individual credit risks. The dominance of FICO credit scores is reflected in the following chart taken from a December 2019 "Investor Overview" presentation that is available on its corporate

1

website: [1]



4.      TransUnion, Experian, and Equifax (collectively "Credit Bureaus" or "Credit Reporting Agencies" ("CRAs")) collect information on the credit and financial history of an individual. They then package that into an individual credit report that can then be sold either to a lender or a consumer. Such reports typically include FICO credit scores information that is licensed from FICO. Each of the Credit Bureaus has longstanding contracts that reflect this agreement. Fair Isaac and Experian renewed a contract allowing the latter to sell FICO scores to North American financial institutions and businesses in May of 2013.[2]  Fair Isaac and Equifax renewed a long term, multi-year agreement to provide FICO scores to financial institutions and other businesses in November of 2013.[3]  And Fair Isaac and TransUnion reached an "Analytic and Data License

_____

[1] FICO: The Decisions Company (Dec. 2019), available at https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

[2] Fair Isaac, *FICO and Experian Renew Agreement to Provide FICO® Scores to North American Financial Institutions and Businesses* (May 8, 2013), available at https://fico.gcs-web.com/news-releases/news-release-details/fico-and-experian-renew-agreement-provide-ficor-scores-north.

[3] Fair Isaac, *FICO and Equifax Renew Agreement to Provide FICO® Scores to U.S. Financial Institutions and Businesses* (Nov. 6, 2013), available at https://fico.gcs-web.com/news-releases/news-release-details/fico-and-equifax-renew-agreement-provide-ficor-scores-us.

Agreement" ("ADLA") in February of 2015.[4]

5.      The three Credit Bureaus created their own credit score that competed with the FICO credit scores since March of 2006, when they formed a joint venture known as VantageScore Solutions, LLC ("VSS"). The new credit score is known as "VantageScore" and utilized a three-digit credit score, but, as explained below, is significantly broader than FICO in terms of the number of individuals covered by it.

6.      Fair Isaac viewed this development as a competitive threat and filed a lawsuit against the Credit Bureaus in October of 2006, in which it accused them of copyright infringement (by using a three digit credit score when Fair Isaac also used one), unfair advertising, and antitrust violations by entering into the joint venture and marketing a competing credit score. As part of its requested relief, Fair Isaac sought that "[t]he Defendants be ordered to dissolve VantageScore and/or to take all measures necessary to prevent VantageScore from having an unreasonable anticompetitive effect in any market." "Second Amended Complaint" at 86 (April 18, 2007) (ECF No. 81) in *Fair Isaac Corp. V. Equifax, Inc.*, No. 06 CV 4112 (ADM/JSM) (D. Minn.). It made this claim, even though at the time, Fair Isaac had 94% of the B2B market. *Fair Isaac Corp. v. Experian Info. Solutions, Inc*., 645 F.Supp.2d 734, 738 (D. Minn. 2009). Summary judgment was entered in favor of the Credit Bureaus on the antitrust and false advertising claims, but the trademark claim was allowed to be tried to a jury. *Id*. at 764.[5] The jury found against Fair Isaac on the trademark claim, ruling that the mark "300-850" (which denoted the range of FICO credit scores) was merely descriptive. It also found that: (a) Fair Isaac made a false representation during the application process to the Patent & Trademark Office ("PTO") for the registrations of the "300–850" marks; (2) Fair Isaac knew that

---

[4] Fair Isaac, *FICO and TransUnion Renew Agreement to Provide FICO® Scores to U.S. Financial Institutions and Businesses* (Feb.9, 2015), available at https://fico.gcs-web.com/news-releases/news-release-details/fico-and-transunion-renew-agreement-provide-ficor-scores-us.

[5] Equifax had settled the litigation in June of 2008, and had formed what Fair Isaac called "a partnership to develop and sell advanced analytics and scoring solutions for businesses and consumers." Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), available at https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations. The district court refused to overturn that verdict. *Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, 711 F.Supp.2d 991 (D. Minn. 2010). It noted that "[t]his extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry." *Id.* at 1000. The United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling. *Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, 650 F.3d 1139 (8th Cir. 2011).

7.      Rebuffed by the courts in its attempts to prevent competition by VSS, Fair Isaac elected to take another approach. When its existing licensing agreements with each Credit Bureau expired in 2013 or 2015, it entered into new or renewed agreements that had onerous provisions designed to limit the competitive impact of VantageScore by: (a) preventing Credit Bureaus who sold FICO credit scores along with Fair Isaac from distributing "equivalent products"; (b) requiring that when a lender sought to pre-qualify a customer for credit, Fair Isaac could charge a multiple of the normal cost of a FICO credit score if the Credit Bureau provided the customer with any competing credit score; and (c) requiring Credit Bureaus who offer discounted prices of credit scores to make them available to Fair Isaac. These provisions, viewed as a whole, operated as naked attempts to allocate the market for credit scores provided to businesses. They were aimed at the only significant competing credit score: VantageScore. And they operated against the owners of VSS. They constituted unreasonable restraints of trade.

8.      The Credit Bureaus were coerced into accepting these provisions because of Fair Isaac's market power and the dominance of the FICO credit scores. That made them co-conspirators with Fair Isaac. As the United States Court of Appeals for the Seventh Circuit has stated, "courts [in a] variety of settings, conclud[e] that the 'combination or conspiracy' element of a [Sherman Act] section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *MCM Partners v. Andrews-Barlett & Assocs., Inc.*, 62 F.3d 967, 971 (7th Cir. 1995). TransUnion, for example, notes in paragraph 81 of its counterclaim in *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D.Ill.) ("TU Action") the TU Action

4

that the 2015 ADLA was presented to it October 3, 2014, less than three months before the 50 agreements that it replaced were set to expire; TransUnion was under "immense time pressure" to get a deal done and Fair Isaac gave it no time extensions.

9.      In addition to its anticompetitive litigation and these contractual requirements, and as explained below, Fair Isaac did everything in its power to publicly denigrate VantageScore and attempt to limit its penetration into lending sectors in which the FICO credit score was the only available option, such as residential mortgages serviced by Fannie Mae and Freddie Mac. It disseminated a campaign of disinformation against VantageScore, calling it a "fako" score.[6] It raised the same antitrust arguments against VantageScore that had not been accepted by the Eighth Circuit in 2011.[7] The Federal Housing Finance Agency ("FHFA") ultimately rejected this recycled bogus contention.[8]

10.      As a result of the totality of these tactics, the Credit Bureaus have been significantly impeded in their ability to market an alternative to the FICO credit scores that would have given businesses a competitive choice and could have greatly improved the creditworthiness of many individual borrowers.

11.      By unlawfully maintaining its monopoly through such anticompetitive tactics, Fair Isaac has been able to partially exclude VSS from competing fully for all customers in the market. It has also been able to raise prices for its credit scoring products with impunity. For example, according to a report from January of 2019, "[t]he company behind the FICO credit score, Fair Isaac Corporation (NYSE:FICO), reported a 13% increase in revenue and a 22% increase in net income in

---

[6] Financial Times, *Credit score row as FICO chief hits out at banks over 'Fako' rivals* (Dec. 5, 2017) ("FT Article") available at https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6.

[7] Quantilytic LLC, RISKS AND OPPORTUNITIES IN EXPANDING MORTGAGE CREDIT AVAILABILITY THROUGH NEW CREDIT SCORES at 22 (Sept. 2017) (research sponsored by Fair Isaac ) ("Quantlytic Report"), available at https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf.

[8] FHFA, Validation and Approval of Credit Score Models, 84 Fed. Reg. 41886, 41891-92 (Aug. 16, 2019).

its fiscal first-quarter earnings report. Price increases in its credit scoring segment and gains in applications sold to banking institutions helped the company log year-over-year gains in revenue and profit."[9]

12.     Courts and the Antitrust Division of the United States Department of Justice ("DOJ") have taken notice of Fair Isaac's conduct.

13.     In December of 2017, Fair Isaac sued TransUnion for unpaid royalties under the ADLA. In February of 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac. ECF No. 38 in the TU Action. In paragraphs 38-60 of that counterclaim (which was partially redacted), it disclosed publicly for the first time the onerous and anticompetitive terms that had been imposed upon it.  The actual agreement was filed under seal. Fair Isaac moved to dismiss the counterclaim. The Honorable Sharon Johnson Coleman rejected that motion, saying:

> The Court finds that, at this juncture, TransUnion has adequately pled actual and attempted monopolization. TransUnion alleges that FICO engages in practices that are intended to drive out competition. Obviously, FICO has no duty to help its competitors. However, TransUnion puts forth claims that, if proven, could establish that FICO's exclusive dealing provisions are unlawful attempts to "maintain monopoly power through exclusionary conduct." Corporations can use exclusive contracts to maintain monopolies. Parties can also use prices to maintain monopoly power.

*Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D.Ill. March 27, 2019).

14.     On March 15, 2020, Fair Isaac issued a notice saying that "[o]n Friday, March 13, 2020, FICO was notified that the U.S. Department of Justice, Antitrust Division, opened a civil investigation into potential exclusionary conduct by FICO."[10] It raised the likelihood that the

---

[9] Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), available at  https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13-revenue-growth-in.aspx.

[10] Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (March 15, 2020), available at https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

investigation may be related to TransUnion's antitrust counterclaim.

15.     The Department of Justice's ("DOJ") issuance of civil investigative demands ("CIDs") was not a minor matter. Its Antitrust Division Manual states that CIDs may be served on suspected violators if "there is 'reason to believe' that any violation within the Division's scope of authority has occurred."[11] As Gene Kimmelman, a former official in the DOJ's Antitrust Division, has noted, "[t]he Justice Department doesn't just launch investigations as fishing expeditions . . . There's a keen awareness that when they request documents, there's a significant cost to companies, it's not easy and there are a lot of expenditures . . . They have to have a strong reason to believe there may be a violation of law."[12]

## II.     PARTIES

### A.     Plaintiff

16.     Plaintiff Kenmore is a credit union with a principal place of business at 258 Highland Parkway, Buffalo, N.Y. 14223.

17.     Plaintiff is a member-owned, non-profit credit union where members save and lend with one another. Surplus funds are given back to members in the form of higher dividends, lower loan rates and money-saving promotions.

18.     During the Class Period, Plaintiff directly purchased B2B Credit Scores from Fair Isaac and a Credit Bureau Defendant.

19.     Plaintiff was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law, as described below.

20.     Plaintiff is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

---

[11] *See* United States Department of Justice, Antitrust Division Manual, at III-45 (5th ed. April 2015), available at http://www.justice.gov/sites/default/files/atr/legacy/2015/05/13/atrdivman.pdf.

[12] Drew Harwell, Ashley Halsey III, & Thad Moore, *Justice Dept. investigating potential airline price collusion*, Washington Post (July 1, 2015), available at https://www.washingtonpost.com/business/economy/doj-investigating-potential-airline-collusion/2015/07/01/42d99102-201c-11e5-aeb9-a411a84c9d55_story.html.

**B.      Defendants**

21.      Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California 95110.

22.      Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principal place of business at 1550 Peachtree St. NW, Atlanta, GA 30309.

23.      Defendant Experian is a Credit Bureau incorporated in Ireland that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, CA 92626.

24.      Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W Adams St., Chicago, IL 60661.

## III.      JURISDICTION, VENUE, AND INTERSTATE COMMERCE

25.      This action arises under Sections 1 through 3 of the Sherman Act (15 U.S.C. §§1-3) and Sections 4 & 16 of the Clayton Act (15 U.S.C. §§15 & 26).

26.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337.

27.      The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims.

28.      Venue is proper in this District under 15 U.S.C. §§15(a) & 22, and 28 U.S.C.§1391(b), (c) and (d), because, during the Class Period, Defendants resided, transacted business, were found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

29.      During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories, including in this District.

30.      During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States mail, to effectuate their illegal scheme.

31.      Defendants' conduct also had a substantial effect on the intrastate commerce of the states listed in counts Four and Five of this Complaint.

32.      This Court has personal jurisdiction over Defendants because Defendants transacted

8

business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. The unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## IV.   FACTUAL ALLEGATIONS

### A.   Credit Scores And Credit Reports

33.     A credit score is a three-digit number, typically between 300 and 850, designed to represent an individual's credit risk, or the likelihood that he or she will pay his or her bills on time.

34.     Credit scores are calculated using information in an individual's credit reports, including an individual's payment history, the amount of debt he or she has, and the length of the individual's credit history. Higher scores mean that the individual has demonstrated responsible credit behavior in the past, which may make potential lenders and creditors more confident when evaluating a request for credit. Credit scoring companies like Fair Isaac and VSS apply complex algorithms to arrive at a numerical credit score.

35.     Credit scores are accompanied by "reason codes", which explain to the potential lender or creditor why the score was not higher. VantageScore explains this process as follows:

> No matter where you get your score, the documents that accompany it will include up to four or five statements explaining why your score wasn't higher. These statements are called reason codes and sometimes go by several other names. Some people call them score factors; others call them adverse action codes. They're all the same thing.
>
> The next time you see your credit score, regardless of where it comes from, look for the reason codes. They'll be worded and displayed something like this:
>
> Your Credit Score Is: 705
>
> 32: Balances on bankcard or revolving accounts too high compared to credit limits
>
> 16: The total of all balances on your open accounts is too high
>
> 85: You have too many inquiries on your credit report
>
> 13: Your most recently opened account is too new

The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.

The four (or five) factors are listed in order of the impact they have. In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to credit limits." That means the consumer's credit card debt is too high relative to his or her credit limits.

In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high." That means the consumer is carrying too much debt on his or her open accounts.

The third reason the score isn't higher is "You have too many inquiries on your credit report." This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.

The fourth reason the score isn't higher is "Your most recently opened account is too new." Clearly this means the consumer has a very new account on his or her credit report.[13]

36.    Fair Isaac has a webpage that sets forth its various "reason codes."[14] VantageScore has a dedicated website that explains its various "reason codes."[15]

37.    Credit Bureaus collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit reporting company. Utilizing these files, Credit Bureaus create a credit report, which is a statement that has information about an individual's credit activity and current credit situation, such as loan paying history and the status of credit accounts. The information contained in such reports is used to create credit scores.

38.    Credit Bureaus sell these credit reports to lenders or creditors ("B2B Purchasers") in the "B2B market". They also sell them to individuals wishing to monitor their own credit ( "B2C"

---

[13] https://www.reasoncode.org/reasoncode101.

[14] Fair Isaac, US FICO® Score Reason Codes, available at https://www.fico.com/en/resource-download-file/3425.

[15] https://www.reasoncode.org.

purchasers).

39.     With its dominant position in the B2B Credit Score Market, Fair Isaac uses the Credit Bureaus to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus. To facilitate the sale of its FICO Scores to B2B Purchasers, Fair Isaac enlists the assistance of the Credit Bureaus.

40.     Thus, when a B2B purchaser requires a credit score, it purchases the report from the Credit Bureau, and the credit score jointly from the Credit Bureau and Fair Isaac. Although the payment may at times occur in a combined transaction, the reality is that both the Credit Bureau and Fair Isaac act as the provider of the FICO score.

41.     In its 2019 Form 10-K filed with the Securities & Exchange Commission, Fair Isaac states at page 11 that "[o]ur scores are marketed and sold through credit reporting agencies. During fiscal 2019, 2018 and 2017 years, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 29%, 25% and 20% of our total revenues, respectively."[16]

42.     FICO scores and credit reports are often sold to businesses as a bundle. Such bundles can be sold by Credit Bureaus, which are licensed by Fair Isaac to sell the FICO score and in return, pay a royalty to Fair Isaac.  Such bundles can also be sold directly by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the Credit Bureau selected by the lender or consumer. The Credit Bureau applies Fair Isaac's Bureau-tailored FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the Credit Bureau for the cost of processing and providing the bundle."[17] Thus, Fair Isaac and the Credit Bureaus compete with each other in some respects.

### B.     The Markets for Credit Scores in the United States

---

[16] Available at
http://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_FICO_2019.pdf. ("2019 Form 10-K").

[17] *Fair Isaac Corp. v. Equifax, Inc.*, No. 06-4112, ADM/JSM, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

43.     As noted above, there are distinct B2B and B2C Credit Score Markets. The latter involves sales from a business (a Credit Bureau and/or the credit score generator) to a lender, creditor or financial institution. The latter involves sales directly to an individual. The claims in this case concern the former market, which is the relevant product market in which the claims made here that require a market definition are to be assessed.

44.     Fair Isaac has recognized the existence of these distinct markets.  For example, in its 2019 Form-10K, it states: "*Scores*. This segment includes our business-to-business scoring solutions and services, our business-to-consumer scoring solutions and services including myFICO® solutions for consumers, and associated professional services."[18] Likewise, Fair Isaac measures quarterly scores revenues with "the company's business-to-business (B2B) scoring solutions and associated professional services, and business-to-consumer (B2C) service", as reflected in its recent earnings report for the first quarter of 2020.[19]

45.     Indeed, the credit scores that lenders purchase often differ significantly from the credit scores that consumers purchase. The Consumer Financial Protection Bureau ("CPFB") noted in a 2011 report that "[i]t is important to note that many of the credit scores sold to lenders are not offered for sale to consumers."[20] The agency went on to explain:

> When a consumer purchases a score from a CRA [Credit Bureau], it is likely that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model

---

[18] Fair Isaac 2019 Form 10-K at 3.

[19]  Fair Isaac, FICO Announces Earnings of $1.82 per Share for First Quarter Fiscal 2020 (Jan. 30, 2020), available at https://fico.gcs-web.com/news-releases/news-release-details/fico-announces-earnings-182-share-first-quarter-fiscal-2020.

[20] CFPB, *The impact of differences between consumer- and creditor-purchased credit scores,* at 1 (July 9, 2011), available at https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[21]

46. The United States (including its territories) is the relevant geographic market in which B2B credit scores are provided. The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses throughout the United States.

47. The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article on seekingalpha.com,

Such [market] stability partly reflects FICO's high barriers to entry. Although it should, in theory, be possible for another company to develop competing algorithms (and many have tried), the reality has proven somewhat different. The credit bureaus themselves - arguably the best positioned potential competitors - tried for some years to muscle in on FICO's turf through the Vantage score.

However, Vantage has failed to gain meaningful traction and Experian's deal to offer FICO scores on its websites in 2014 represents a pragmatic step to reflect FICO's continued dominance.

In-house risk management tools have likewise been used to enhance, rather than replace, the FICO score. Whilst the score is rarely the only input in a lending decision, it tends to be deeply embedded in the processes of the lenders. The FICO score forms an important component of the risk management process - one that continues to be used even when parallel and/or complementary risk management tools have been developed.[22]

---

[21] *Id.*

[22] *Fair Isaac: A Royalty on U.S. Credit Scoring* Sept. 25, 2018), available at https://seekingalpha.com/article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

48.     The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for this embedding.

49.     The same article notes further that "[t]he deep integration of FICO scores and products into companies' operations has raised switching costs." Likewise, VSS has observed that in the residential mortgage sector, FICO's "imprint inhibits competition by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial negotiating leverage with almost every participant in the industry."[23]  And one blog posting from 2011 observed that:

> Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios.  After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes. Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed.  Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8).  This wasn't a migration to a new score mind you, just a more recent version of the score they're already using.  The barriers to entry are indeed high…and expensive.[24]

50.     This blog posting also illustrates "network effects" that serve as a barrier to entry into the B2B Credit Score Market. As noted by one analyst, "[t]he 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[25] In 2011, at Fair Isaac's Analyst/Investor Day, its then-CEO, Mark Greene, explained: "[i]n about 10 seconds, an entire commerce transaction taking

---

[23] VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), available at https://www.vantagescore.com/news-story/292/vantagescore-solutions-issues-statement-reacting-fhfas-propo.

[24] John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon* (July 5, 2011), available at https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/.

[25] Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low* (Dec. 17, 2019), available at https://seekingalpha.com/article/4312953-fair-isaac-share-buybacks-likely-to-end-cash-reserves-run-low.

place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate. And that network effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[26]

### C. Fair Isaac's Monopoly Power in the B2B Credit Score Market

51. Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring algorithms until the mid-1970s, and continues to wield a dominant market share.[27] At page 10 of its 2019 Form 10-K, it states:

> Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies. End users of our products include 98 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world. Our clients also include more than 700 insurers, including nine of the top ten U.S. property and casualty insurers; more than 400 retailers and general merchandisers; more than 150 government or public agencies; and more than 150 healthcare and pharmaceuticals companies, including seven of the world's top ten pharmaceuticals companies. All of the top ten companies on the 2019 Fortune 500 list use FICO's solutions. In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies.

52. At the myFICO website,[28] Fair Isaac presents the following chart that depicts its dominance, noting that FICO scores are used by 90% of top lenders in 90% of lending decisions:

---

[26] Fair Isaac Corp. – Analyst/Investor Day Transcript (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[27] Raymond Anderson, *A History of Credit Scoring* at 75-76 (2019), available at https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B06_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-Credit-Scoring.pdf?origin=publication_detail.

[28] https://ficoscore.com/about/.



53.     An infographic on Fair Isaac's website states that: (a) 10 billion FICO scores are sold annually, compared to McDonald's worldwide sales of 2.4 billion hamburgers; (b) 27.4 million FICO scores are sold daily, compared to 10.4 million cups of coffee sold at Starbucks; and (c) 90% of all lending decisions in the United States rely on FICO scores.[29]

54.     The 2019 Fair Isaac Form 10-K states at page 7 that FICO scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators." At page 3 of the same document, they are called "the standard measure in the U.S. of consumer credit risk."

55.     Fair Isaac's executives have made similar points for years. As far back as 2008, Craig Watts, a public affairs manager with Fair Isaac, called it the "800 pound gorilla."[30] In November of

---

[29] https://www.fico.com/25years/.

[30] Dana Dratch, *What Does 'Good' Credit Really Mean?*(Oct. 30, 2008), available at https://www.cnbc.com/id/27458815.

2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's former Chief Financial Officer and Executive Vice-President, Michael Pung, stated that Fair Isaac's FICO Scores are: (a) the "most widely used credit scoring system here in the U.S."; (b) used by "[v]irtually every major lender in the U.S."; and (c) that Fair Isaac has "maintained a 90-plus percent market share for at least . . . 13 years."

56. Fair Isaac's monopoly in the B2B Credit Score Market for credit scores has given it the power to control prices. Indeed, Fair Isaac's Chief Executive Officer ("CEO"), Will Lansing ("Lansing"), has noted that in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."

**D.    VantageScore's Entry Into The Market And Its Innovative Product**

57. In March of 2006, VantageScore introduced the VantageScore credit scores and credit scoring system. VantageScore is a competitor to FICO score in the B2B Credit Score Market.

58. VantageScore was responsive to a recognized need. Many individuals received no or lower scores under FICO, given that the scoring system was introduced back in 1989 when less data was available. The CPFB issued a report in 2015, which noted that low income individuals, particularly blacks and Hispanics, are often "credit invisibles" who do not have the history that allows them to obtain a credit score.[31]

59. Credit Karma summarized some of the key differences between FICO and VantageScore on its website.[32] One was the weighting of various credit factors:

> The factors that impact your score might carry different weights depending on the model you're looking at. FICO's factor breakdown looks like this:
>
> 35% Credit history
> 30% Credit Utilization
> 15% Length of credit history
> 10% how your credit is mixed
> 10% new accounts opened

---

[31] CFPB Office of Research, *Data Point: Credit Invisibles* at 24 (May 2015), available at https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[32] Credit Karma, *VantageScore vs. FICO: What's the difference?* (Ag. 12, 2019), available at https://www.creditkarma.com/advice/i/vantagescore-vs-fico/.

VantageScore's calculation considers similar factors, but there is a noticeable difference in weights:

40% Credit history
21% age and type of credit
20% Credit utilization
11% Balances
5% Recent credit
3% Available credit

So your score could certainly be impacted based on the type you're using. For example, if your credit utilization ratio is higher, you might want to examine your VantageScore, because it places a smaller weight on credit utilization.

60. Another factor was the duration of credit history:

To have FICO® scores, consumers need to have one or more accounts that have been open for at least six months and at least one account that has reported to the credit bureaus within the past six months (plus no indication on your credit reports of being deceased). Otherwise, FICO won't generate your scores. On the other hand, the VantageScore® model may be able to score consumers who are new to credit or use credit infrequently. VantageScore can use data of just one month's history and one account reported within the previous 24 months. So if you're new to credit or you haven't used credit in a while, you may not have FICO® credit scores, but you might have VantageScore® credit scores.

61. A third difference involved treatment of tax liens and civil judgments:

In July 2017, changes to public-record reporting requirements were implemented that affected the information sent to consumer credit bureaus, leading them to eliminate many tax liens and civil judgments from consumers' credit reports. In response to the changes, tax liens aren't weighed as heavily (but can still have a significant impact) in the latest VantageScore version, VantageScore® 4.0. And they can still have a significant impact on FICO® scoring models.

62. A fourth difference involved the treatment of credit inquiries:

It's a Catch-22. Applying for new lines of credit — such as student loans, credit cards or mortgages — can negatively affect your credit scores. But applying for multiple lines in order to compare rates makes sense if you want to get the best deal. To minimize the impact that shopping for credit can have on your scores, newer FICO® versions count multiple credit inquiries of the same type within a 45-day period as a single inquiry. This can be especially helpful when you're shopping

18

around for a major loan, like for a car, as multiple auto loan inquiries within that window should only count as one hard inquiry. For some older FICO® versions, the single-inquiry period can be 14 days.

VantageScore counts multiple inquiries, even for different types of loans, within a 14-day period as a single inquiry. Multiple inquiries on your reports for the same type of loan or credit, spanning more than a 14-day period, may have a greater impact to your VantageScore® credit scores than to your FICO® scores.

Take note though that according to the Consumer Financial Protection Bureau, mortgage loan inquiries within a 45-day window are recorded as a single hard inquiry.

63. And the final difference of significance involved use of trending data:

Credit scores represent a snapshot of an individual's credit profile at the specific point in time when the scores are generated. The FICO® credit-scoring models, for example, use data about consumers' borrowing and credit utilization that's been reported to the credit bureaus at the time the scores are generated.

VantageScore® 4.0, on the other hand, incorporates data that reflects patterns of behavior over time. The latest scores may include up to two years' worth of consumer spending and credit utilization data in its calculation.

64. VantageScore has achieved some success, particularly in the B2C sector. In a 2018 report, it stated:

During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint. These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model). They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[33]

65. The VantageScore report went on to note that "[a]s lenders adopt VantageScore, we

---

[33] VantageScore, *VantageScore Credit Scores & The Mortgage Market* at 8 (2018) ("VantageScore Report"), available at
https://www.vantagescore.com/images/resources/FAQs%20VantageScore%20Credit%20Scores%2 0and%20the%20Mortgage%20Market.pdf.

believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[34] VantageScore also reported that "[m]any of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately. Credit rating agencies accept loans based on the VantageScore model, and it's the dominant model used in the valuation of previously issued, private-label mortgage-backed securities."[35]

66.     Despite the potential advantages of using VantageScore, Fair Isaac continues to maintain its monopoly in the B2B Credit Score Market. In February of 2013, at a Morgan Stanley Conference, Fair Isaac's Lansing explained that "[s]o our Scores business, which is the cash generator, is a very, very high-margin business. It's deeply embedded into the systems of the bank customers who use it. It doesn't grow quickly. It kind of moves with the economy because it's a function of volume, of originations in the credit business with consumer debt."[36]

**E.     Fair Isaac's Anticompetitive and Exclusionary Conduct**

67.     Fair Isaac has used its monopoly power to coordinate a comprehensive attack on VantageScore that included anticompetitive litigation, a campaign of disparagement and disinformation against VantageScore, efforts to keep VantageScore from upending the monopoly that Fair Isaac enjoyed in the residential mortgage market serviced by Fannie Mae and Freddie Mac, and, most critically, coercion of the Credit Bureaus in 2013-15 to sign on to licensing agreements that undermined their own joint venture. As noted above, the Credit Bureaus may have acceded to such contractual provisions under duress, but that does not mean they are not liable as co-conspirators with Fair Isaac. Indeed, Equifax and Experian have never sought to avoid the anticompetitive provisions in their respective licensing agreements and TransUnion did so only as a counterclaim to a breach of contract suit for overdue royalties filed by Fair Isaac. That counterclaim surfaced three

---

[34] *Id*. at 5.

[35] https://www.vantagescore.com/who-uses-our-model.

[36] Seeking Alpha, Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript) (Feb. 27, 2013), available at https://seekingalpha.com/article/1231981-fair-isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript.

years after it entered into the ADLA with Fair Isaac.

### 1.    Fair Isaac's Anticompetitive Litigation.

68.    Fair Isaac's patent litigation commenced in 2006, a few months after VSS was created, was a classic attempt to eliminate a fledgling competitor. As VSS noted, "[e]arly in our first year of existence, VantageScore was plunged into a legal battle that sought to put us out of business, even as we scrambled to establish a competitive foothold."[37] Fair Isaac raised bogus antitrust claims that it knew were without foundation, given its then 94% of the B2B Credit Score Market. Its primary claim was one for trademark infringement that it knew, and a jury found, was based on a trademark fraudulently obtained from the PTO. Such conduct, as part of the totality of the conduct described herein, violated the antitrust laws. In addition, Fair Isaac's contention that the "300-850" marks were anything other than descriptive was not well founded. The litigation lasted into 2011 and while it was ongoing, VSS was under a cloud. Its potential B2B customers had no way of being sure that its VantageScore product might not be declared infringing on Fair Isaac's trademarks or that VSS would be dissolved. Thus, VSS's growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation directed against it by Fair Isaac that goes on to this day.

### 2.    Anticompetitive Agreements Between Credit Bureaus And Fair Isaac That Restrained Competition And Allocated Markets

69.    In 2011 through the first part of 2013, there were developments that should have furthered VantageScore's ability to compete with FICO scores. In 2011, VSS formed a partnership with the  Consumer Federation of America, a nonprofit association of nearly 300 consumer groups founded in 1968 to advance the consumer interest through research, advocacy, and education; that alliance led to the use of annual consumer surveys to gauge awareness of credit scoring related issues.[38] In October of 2012, the Federal Deposit Insurance Corporation revised its rules for assessing default risk on loans issued by banks with deposits in excess of $10 billion. Instead of evaluating

---

[37] VantageScore, *10 years, 10 milestones* (March 2016) ("VSS 2016 Report), available at https://thescore.vantagescore.com/article/252/10-years-10-milestones.

[38] *Id.*

loans on any particular credit score, the revision called for examining the underlying probability of default ("PD") associated with those loans at the time of origination.[39] VSS published a white paper in April of 2013 explaining how VantageScore could be aligned with the PD.[40] And in March of 2013, VSS debuted a new scoring model, VantageScore 3.0. "The model built on the strengths of its predecessors and drew extensive news coverage for its ability to score 98 percent of adult consumers in the U.S. (including 30-35 million who cannot get scores from conventional credit-scoring models); its disregard of paid collections (including paid medical debt); and its simplified reason codes."[41]

70.     Fair Isaac responded to these developments by inserting anticompetitive clauses in the contracts with Credit Bureaus, commencing with Experian in May of 2013, continuing with Equifax in November of 2013, and culminating with the ADLA between Fair Isaac and TransUnion in February of 2015. As noted above, the discussion below of these anticompetitive licensing agreements is based on TransUnion's description of its ADLA in paragraphs 43-60 of its counterclaim (ECF No. 38 in the TU Action). The ADLA was filed under seal in the TU action and is unavailable to Plaintiff beyond what TransUnion has quoted in its counterclaim. Although TransUnion was dealing with just the ADLA, it stated that it had good reason to believe that similar provisions were contained in the agreements with Equifax and Experian and Plaintiff so alleges here. *See* paragraphs 49, 55, 59 of TransUnion's counterclaim. Thus, the allegations that follow apply generally to all three Credit Bureau Defendants.

71.     The restraints imposed under such contracts consist primarily of: (a) "No Equivalent Products" provisions; (b) "Dynamic Royalty Schedule" provisions, especially as applied in the "pre-Qualification" context; and (c) "Level Playing Field" provisions. Each will be discussed in turn.

### a.     The "No Equivalent Products" Provisions

72.     Fair Isaac has imposed a similar or identical "No Equivalent Products" clause on each

---

[39] *Id.*

[40] VantageScore, *FDIC Risk-Based Assessment System for Large Insured Depository Institutions* (April 2013), available at
https://www.vantagescore.com/images/resources/VantageScore_FDIC%20Webinar_American%20Banker_%20Insert.pdf.

[41] 2016 VSS Report.

of the Credit Bureaus. By imposing a "No Equivalent Products" term, Fair Isaac sought to block the Credit Bureaus from enabling B2B customers from easily switching from FICO scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore alongside or interchangeably with FICO scores. The Credit Bureaus that owned and controlled VSS have agreed to and acquiesced to an allocation of customers. This conduct should be deemed to be a *per se* violation of Sections 1 and 3 of the Sherman Act, or, alternatively, is violative of the same statutes pursuant to a Rule of Reason analysis.

73.     The "No Equivalent Products" clause provides that a Credit Bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac analytic. It also prohibits a Credit Bureau from distributing any competing analytic (*i.e.*, credit scoring system) that is aligned with FICO scores or uses too many of the same reason codes, and the clause expressly names VSS as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

74.     For example, if a competing credit score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then the "No Equivalent Products" clause prevents a Credit Bureau from distributing the competing product. Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits a Credit Bureau from distributing the product.

75.     The "No Equivalent Products" clause effectively prevents a Credit Bureau from developing (contrary to the original goal of VantageScore) or selling an alternative to FICO's Credit Scores that would: (a) be compatible with many B2B Purchasers' systems, models, and processes; and (b) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score. As noted above, many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the

23

particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

76.     The "No Equivalent Products" clause protects and sustains Fair Isaac's monopoly.

77.     The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, the reason codes that may not be used by an "Equivalent Product" were not invented by Fair Isaac, but rather reflect well-established industry best practices for lending.

### b.     The "Dynamic Royalty Schedule" Provision And Fair Isaac's Use of It In The "Pre-Qualification" Context

78.     Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause that allowed Fair Isaac to replace its existing royalty with a new one.

79.     In 2015, Fair Isaac unilaterally imposed, and the Credit Bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing credit score or credit data to consumers "in connection" with the "Pre-Qualification." Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, at the same time, receive their personal Credit Score. The offer of a free credit score to a consumer can entice consumers to apply for credit opportunities.

80.     The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other credit score or credit data are provided to consumers. If a lender purchases a FICO score for use in "Pre-Qualification" and does not provide any credit score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides any other credit score (such as a VantageScore) to the consumer "in connection" with the "Pre- Qualification," there is a

24

different per-score royalty rate that is higher—a penalty rate.

81.      The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores. First, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. Second, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

82.      There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other credit scores to disclose to consumers. This too is a proscribed form of customer allocation. The purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing credit score for disclosure to consumers. This scheme has been effective, and, according to TransUnion, no B2B Purchasers have opted to pay the penalty rate.

### c.      The "Level Playing Field" Provision

83.      Fair Isaac's "Level Playing Field," requires that the prices that are made to one Credit Bureau be made available to the other Credit Bureaus. Taken together, the "Dynamic Royalty Schedule" that led to the imposition of the "Pre-Qualification" royalty change and the "Level Playing Field" clauses enabled Fair Isaac to unilaterally increase the royalty prices it charges for FICO scores. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

84.      Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the Credit Bureaus to extract monopoly prices from B2B Purchasers. These provisions disincentivize a Credit Bureau from negotiating for a lower price because it knows that even if it succeeds, it will not as a result gain a competitive advantage over the other Credit Bureaus.

### 3.      Fair Isaac's Other Efforts To Deter B2B Customers From Using VantageScore

85.      Having successfully induced the Credit Bureaus to agree with Fair Isaac and with each

25

other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac has gone even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore, falsely claiming that VantageScore is an unreliable measure of creditworthiness, and misrepresenting the information considered by VantageScore's credit scoring system.

86.     On December 5, 2017, for example, Lansing, Fair Isaac's CEO,[42] criticized banks for using VantageScore, saying that credit score was "fako"; " 'looks like it, smells like it, feels like it — it's being presented as some kind of an indication of your health, but if you look at the fine print, you'll discover that it's not a FICO score,' he said."

87.     Similarly, on December 12, 2017, Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which is "owned by the credit bureaus," is less reliable than FICO scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for credit scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

88.     The *Wall Street Journal* advertisement directed readers to "[l]earn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post, written in 2016 by Joanne Gaskin ("Gaskin"), the Vice-President of Scores and Analytics at Fair Isaac, asserted: "[d]espite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk

---

[42] FT Article, *supra*.

mortgage credit seekers."[43]

89.     Moreover, the implication that FICO Classic scoring systems provide credit scores for as many consumers as VantageScore is false and misleading. VantageScore provides credit scores for millions of American consumers that are not scored by FICO Classic scoring systems.

90.     Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post by Ethan Dornhelm, Vice-President of FICO Scores and Predictive Analytics, claimed that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance."[44] This statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.[45]

91.     Another blog post written by Gaskin claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[46] This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

92.     Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could then attempt to break Fair Isaac's 100% monopoly in this sector. The public sentiment favored this

---

[43] https://www.fico.com/blogs/author/joanne-gaskin.

[44] https://www.fico.com/blogs/why-bureau-data-alone-can-t-score-more-consumers.

[45] *See* VantageScore Report at 2, 4, 5-6.

[46] https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

move.[47] Fair Isaac did not. It sent Gaskin out early on to give press interviews saying Fair Isaac's alleged monopoly is a "myth."[48] It hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the Credit Bureaus was anticompetitive, an argument it failed to succeed with during the trademark litigation discussed above.[49] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [50]

93.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### 4.     Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition

94.     Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including that which has been taken in concert with the Credit Bureaus, has foreclosed competition in the B2B Credit Score Market by foreclosing opportunities for the Credit Bureaus to sell VantageScore or any other competitive products. The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly and increase its prices for B2B Credit Scores to B2B

---

[47] *See* Bloomberg Business News, This Monopoly Is Holding Back the Mortgage Market (Jan. 18, 2018), available at https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score-monopoly-is-holding-back-the-mortgage-market. *Accord*, Paul Weinstein, Jr., *No company should have a monopoly on credit scoring*, The Hill (Dec. 7, 2017), available at https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit-scoring.

[48] DS News, FICO: *The 'Credit Score Monopoly' is a Myth* (Dec. 18, 2015), available at https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

[49] Quantilytic Report at 4-5.

[50] FHFA, Validation and Approval of Credit Score Models, 84 Fed. Reg. 41886, 41891-92 (Aug. 16, 2019).

Purchasers during the Class Period.

95.     Fair Isaac's conduct, in concert with the Credit Bureaus, including by the contracts entered into by the Credit Bureaus, has reduced choice for B2B Purchasers. The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace. Indeed, prior to settling the aforementioned trademark litigation with Equifax in June of 2008, Fair Isaac modeled future losses it might suffer with respect to competition from VantageScore and predicted "substantial double-digit declines."[51]

96.     Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO score. For example, thebalance.com—a website devoted to personal finance issues—posted in February of 2017 and online to this day: "If you purchased your Credit Score anywhere but myFICO.com, then it's a Fako score."[52]

## V.     CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action on behalf of itself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

> All B2B Purchasers residing in the United States and its territories that directly purchased a FICO score from Fair Isaac and/or a Credit Bureau during the period from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased, other than entities who purchased a FICO score in connection with mortgage lending conforming to the credit score validation approval procedure of Fannie Mae and Freddie Mac.

Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates. Also excluded are any natural persons that purchased their own Credit

---

[51] *Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, No. 06-4112 (ADM/JSM), 2008 WL 11843223, at *2, *3 (D. Minn. Nov. 3, 2008).

[52] Latoya Irby, *FICO & FAKO Credit Scores*, THE BALANCE, available at https://www.thebalance.com/fico-and-fako-credit-scores-960497.

Score solely via myFico.com, the Credit Bureaus, or other entities for their personal use. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

98.     Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendant.

99.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendant.

100.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of members of the Class.

101.     Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

102.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

      a.   whether Fair Isaac monopolized, and whether Defendants conspired to monopolize, or unreasonably restrained trade, in violation of federal law;

      b.   whether Fair Isaac monopolized, and whether Defendants conspired to monopolize, or unreasonably restrained trade, in violation of certain state antitrust laws;

      c.   whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

      d.   the duration of the alleged unlawful conduct;

      e.   injury suffered by Plaintiff and members of the Class;

    f.   damages suffered by Plaintiff and members of the Class; and

    g.   whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

103.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

104.    The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

105.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

106.    Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    STATUTES OF LIMITATIONS AND TOLLING

107.    Plaintiff and the class did not know of Defendants' anticompetitive conduct and the injuries it caused prior to four years before the filing of this complaint. Nor did Plaintiff and the class have knowledge of any facts that would reasonably put them on inquiry notice of Defendants' anticompetitive conduct and the injuries it caused prior to four years before the filing of this complaint.

108.    By its very nature, much of the unlawful activity in which Defendants engaged was self-concealing from Plaintiff and the Class. As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiff and members of the Class have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

109.    Any applicable statutes of limitations were tolled at least until February 12, 2018, the date that TransUnion filed its Counterclaim against Fair Isaac in the TU Action.

## VII.    CLAIMS FOR RELIEF

### CLAIM ONE: MONOPOLIZATION (15 U.S.C. §2)

110.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

111.    The relevant product market is the market for the sale of B2B Credit Scores.

112.    The relevant geographic market for the sale of B2B Credit Scores is the United States and its territories.

113.    The B2B Credit Score Market is the relevant market.

114.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

115.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

116.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

117.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B credit scores in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

118.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

119.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

120.    Fair Isaac's monopolization has injured and will continue to injure competition in this market.

121.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

122. The anticompetitive conduct raised the prices for FICO scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

123. Plaintiff and members of the Class have been injured in their business or property by reason of Fair Isaac's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act (15 U.S.C. §15).

124. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act (15 U.S.C. §26).

## CLAIM TWO: CONSPIRACY TO MONOPOLIZE
## (15 U.S.C. §2)

125. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

126. The relevant product market is the market for the sale of B2B Credit Scores.

127. The relevant geographic market for the sale of B2B Credit Scores is the United States and its territories.

128. The B2B Credit Score Market is the relevant market.

129. Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

130. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

131. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

132. Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

133. Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

33

134.    Fair Isaac entered into an agreement, combination or conspiracy with Experian, Equifax, and TransUnion to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements with each of the them. In these agreements, the Credit Bureaus and Fair Isaac agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the Credit Bureau Defendants further agreed that the Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

135.    These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO scores from Plaintiff and members of the Class.

136.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

137.    Defendants' conspiracy to monopolize has injured and will continue to injure competition in this market.

138.    Defendants have acted with the specific intent of allowing Fait Isaac to monopolize the market for B2B Credit Scores in the United States and its territories.

139.    Defendants' conspiratorial acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

140.    The conspiracy raised the prices for FICO scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

141.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act (15 U.S.C. §15).

142.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act (15 U.S.C. §26).

## CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE
## 15 U.S.C. §§ 1, 3

143. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

144. The agreements between Fair Isaac and each of the Credit Bureau Defendants should be treated as *per se* violations of Sections 1 and 3 of the Sherman Act (15 U.S.C §§1, 3) because they are agreements between Fair Isaac and the three co-venturers in one of its horizontal competitors who controlled that competitor and because Fait Isaac and the Credit Bureau compete for the sale of FICO scores in the B2B Credit Score Market.

145. Should the Court disagree, however, it is alleged in the alternative that these agreements violate Sections 1 and 3 of the Sherman Act under a Rule of Reason analysis.

146. The relevant product market is the market for the sale of B2B Credit Scores.

147. The relevant geographic market for the sale of B2B Credit Scores is the United States and its territories.

148. The B2B Credit Score Market is the relevant market.

149. Fair Isaac had and continues to have at least a 90% market share in the B2B Credit Score Market.

150. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

151. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

152. Fair Isaac entered into agreements with TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

153. The agreements between Fair Isaac and each of the Credit Bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

154. The agreements raised the price for FICO Scores above the competitive level and

otherwise injured competition without any offsetting procompetitive benefit to consumers.

155.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

156.    Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

157.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' violation of Section 1 and 3 of the Sherman Act, within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

158.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

## CLAIM FOUR: STATE ANTITRUST LAWS

159.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

160.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following antitrust statutes.

161.    Arizona: Defendants' anticompetitive conduct has restrained trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of the unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade and Defendants have restrained trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

162.    California: During the Class Period, Defendants engaged in anticompetitive conduct in unreasonable restraint of trade and commerce in violation of California Business and Professions Code sections 16700, *et seq*. To the extent that Plaintiff seeks recovery for Fair Isaac's acts of monopolization under these statutory provisions, whie Section 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where

the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. That is what happened here. This conduct constitutes a "combination" under the Cartwright Act. As a direct result of Defendants' unlawful conduct, Plaintiff and the Class were overcharged when they purchased their FICO credit scores.

163.    District of Columbia: Defendants' anticompetitive conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

164.    Illinois: Defendants' anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.). During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.). Accordingly, Plaintiff and members of the Class seek all forms of relief available under District of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.).

165.    Iowa:  Defendants' anticompetitive conduct has restrained trade in violation of Iowa Code §§ 553.1, *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Iowa Code §§ 553.1, *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under Iowa Code §§ 553, *et seq*.

166.    Kansas: Defendants' anticompetitive conduct has restrained trade in violation of

37

Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

167.    Maine: Defendants' anticompetitive conduct has restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.). During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

168.    Michigan: Defendants' anticompetitive conduct has restrained trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

169.    Minnesota: Defendants' anticompetitive conduct has restrained trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

170.    <u>Mississippi</u>: Defendants' anticompetitive conduct has restrained trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiff and members of the Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

171.    <u>Nebraska</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

172.    <u>Nevada</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq*.

173.    <u>New Hampshire</u>: Defendants' anticompetitive conduct has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under New Hampshire Revised Statutes

39

§§ 356:1, *et seq.*

174.  New Mexico:  Defendants' anticompetitive conduct has restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

175.  New York: Defendants' anticompetitive conduct has restrained trade in violation of New York General Business Laws §§ 340, *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the New York's Donnelly Act, §§ 340, *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

176.  North Carolina: Defendants' anticompetitive conduct has restrained trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.* During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiff and members of the Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

177.  North Dakota: Defendants' anticompetitive conduct has restrained trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq.* During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiff

and members of the Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

178. <u>Oregon</u>: Defendants' anticompetitive conduct has restrained trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

179. <u>South Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

180. <u>Tennessee</u>: Defendants' anticompetitive conduct has restrained trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

181. <u>Utah:</u> Defendants' anticompetitive conduct has restrained trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are

threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

182.    Vermont: Defendants' anticompetitive conduct has restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

183.    West Virginia: Defendants' anticompetitive conduct has restrained trade in violation of West Virginia Code §§ 47-18-1, *et seq.* During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

184.    Wisconsin: Defendants' anticompetitive conduct has restrained trade in violation of Wisconsin Statutes §§ 133.01, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and members of the Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

185.    Plaintiff and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization. Plaintiff and members of the Class have paid more for FICO credit scores than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above

42

states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

186. In addition, Defendant Fair Isaac has profited significantly from the aforesaid unlawful conduct. Its profits derived from its unilateral and conspiratorial anticompetitive conduct come at the expense and detriment of Plaintiff and members of the Class.

187. Accordingly, Plaintiff and members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## CLAIM FIVE: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS

188. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

189. By reason of the foregoing, Defendants have violated, and Plaintiff and members of the Class are entitled to relief under, the Unfair and Deceptive Trade Practices and Consumer Protection Laws of the following jurisdictions.

190. Arkansas: Defendants have engaged in unfair, unconscionable, and/or deceptive practices in violation of the Arkansas Code Annotated, § 4-88-101, *et. seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO credit scores were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Class. The aforementioned conduct on the part of the Defendant constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful

43

conduct of the Defendants, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

191.    California: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*.  During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendant for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following:  (1) the violations of Section 1, 2, and 3 of the Sherman Act, as set forth above; and (2) the violations of Section 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of  FICO credit scores in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result

44

of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and members of the Class to pay supracompetitive and artificially-inflated prices for FICO credit scores. Plaintiff and members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants have been unjustly enriched as a result of its wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

192.  <u>District of Columbia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO credit scores were sold, distributed or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they was being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO credit scores. Defendants had the sole power to set that price and Plaintiff and members of the Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Class lacked any meaningful choice in purchasing FICO credit scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO credit scores, including their illegal conduct with respect to fixing the price of FICO credit scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly

45

benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Class. The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO credit scores. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

193. <u>Florida</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

194. <u>Massachusetts</u>: Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of the Massachusetts Consumer Protection Mass. Gen. Law Ch. 93A, *et. seq*. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in Massachusetts, and Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Law Ch. 93A, *et. seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under Section 11 of that statute.

195.    Montana: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq*. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout Montana; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

196.    New Mexico: Defendants have engaged in unfair competition or unfair,

47

unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO credit scores were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and members of the Class and the prices paid by them for FICO credit scores as set forth in N.M.S.A., § 57-12-2E. Plaintiff and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendant for the FICO credit scores. Defendant Fair Isaac had the sole power to set that price and Plaintiff and members of the Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Class lacked any meaningful choice in purchasing FICO credit scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO credit scores, including their illegal conduct to fix the price of FICO credit scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendant at the expense of Plaintiff and the public. Defendant took grossly unfair advantage of Plaintiff and members of the Class. The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO credit scores. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores . During the Class Period, Defendants' illegal conduct substantially affected New Mexico

48

commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

197.    <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Class. Defendants made public statements about the prices of FICO credit scores that omitted material information that rendered the statements that they made materially misleading; and Defendant alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased FICO credit scores were misled to believe that they were paying a fair price for FICO credit scores or the price increases for FICO credit scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct. Defendants knew that their unlawful trade practices with respect to pricing FICO credit scores would have an impact on New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing FICO credit scores would have a broad impact, causing consumer class members who indirectly purchased FICO credit scores to be injured by paying more for FICO credit scores than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects:   (1) FICO credit scores price competition was restrained, suppressed, and eliminated

throughout New York; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO credit scores in New York. Plaintiff and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

198. <u>North Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendant to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO credit scores created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conduct. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the

50

Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO credit scores in North Carolina. Plaintiff and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

199.    <u>Rhode Island</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*) Members of this Class purchased FICO credit scores for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores . As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Class

51

suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Class as they related to the cost of FICO credit scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

200.    <u>South Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq*.) Defendants' monopolization had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for the FICO credit scores during the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiff and the members of the Class seek all relief available under that statute.

201.    <u>Vermont:</u> Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO

credit scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO credit scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO credit scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for the FICO credit scores. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, et seq., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and members of the Class, respectfully prays that This Honorable Court:

A.    Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that it be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.    Adjudge that Defendants violated the federal antitrust laws as set forth above;

C. Adjudge that Defendants violated the state antitrust and unfair and deceptive trade practices laws as set forth above;

D. Award Plaintiff and members of the Class actual, treble, and exemplary damages;

E. Award Plaintiff and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

F. Award Plaintiff and members of the Class pre- and post-judgment interest;

G. Enjoin Defendants from their violations of law; and

H. Grant such other, further and different relief, including structural relief, as may be just and proper.

## IX. DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues so triable.


Dated: May 6, 2020

*s/ Shannon M. McNulty*
Robert A. Clifford
Shannon M. McNulty
**CLIFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, Suite 3100
Chicago, IL  60602
Tel.: (312) 899-9090
Fax: (312) 251-1160
rclifford@cliffordlaw.com
smm@cliffordlaw.com


Hilary K. Scherrer[53]
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, DC  20006
Tel.: (202) 540-7200
Fax: (202) 540-7201
hscherrer@hausfeld.com
pgallagher@hausfeld.com

---

[53] *Pro hac vice* applications to be submitted for undersigned non-resident counsel not admitted before this Court.

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
Tel.: (415) 633-1908
Fax: (415) 358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com


Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY  10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com


Arthur Bailey
**RUPP BAASE PFALZGRAF
CUNNINGHAM LLC**
1600 Liberty Building
424 Main Street
Buffalo, NY  14202
Tel.: (716) 664-2967
Fax: (716) 664-2983
bailey@ruppbaase.com


*Counsel for Plaintiff*